**In re FLEET/NORSTAR SECURITIES LITIGATION.**

**CA No. 90–0173B.**

United States District Court,
D. Rhode Island.

July 31, 1996.

Richard Schiffrin, Schiffrin & Craig, Bala Cynwyd, PA, Thomas S. Shapiro, Shapiro, Grace & Haber, Boston, MA, Steven J. Toll, Cohen, Milstein, Hausefeld & Toll, Washington, D.C., Robin P. Zwerling, Zwerling, Schacter & Zwerling, New York City, Michael Gottsch, Burt & Pucillo, Haverford, PA, Robert M. Kornreich, Wolf, Popper, Ross, Wolf & Jones, New York City, Daniel J. Schatz, Dept. of Business Reg., Providence, RI, Ralph Ellis, Abbey & Ellis, New York City, Rochelle Rottenstein, Stull, Stull & Brody, New York City, Richard Greenfield, Haverford, PA, for Plaintiffs.

Patricia Sullivan, Michael Levin, Edwards & Angell, Providence, RI, Roger P. Fendrich, Scott B. Schreiber, Arnold & Porter, Washington, D.C., for Defendants.

## OPINION

FRANCIS J. BOYLE, Senior District Judge.

### I. Introduction

Pursuant to Fed.R.Civ.P. 23.1 and 23(e), the Court's task is to approve or reject a settlement agreement reached by the litigants in both a class action and a derivative action suit. The settlement agreement additionally requests the Court to award appropriate attorney fees for Plaintiffs' counsel. Therefore, part and parcel with the settlement decision, the Court must fashion attorney fees for both the class action and derivative suit.

### II. Background

In 1990, the plaintiffs Joseph Weitzman and Stanford Wynn brought a securities fraud class action suit against the defendant Fleet/Norstar Financial Group, Inc. ("Fleet" or the "Company"), its Chief Executive officer, Terrence Murray, Chief Financial Officer, John Flynn, and twenty additional individual defendants.[1] The plaintiffs were purchasers of Fleet common stock and allegedly suffered losses in 1990 after purchasing or reinvesting in Fleet stock due to the defendants' alleged violations of securities laws and common law.

The plaintiffs allege that during the class period of March 14, 1989, through April 3, 1990, the defendants materially misrepresented the financial condition of Fleet. The alleged effect was to inflate the market price of the corporation's stock. According to the plaintiffs, the purpose was to increase defendants Murray's and Flynn's renumeration, because part of their compensation was tied

1. The following are the defendants named in the class action complaint: William Barnet, III, Bradford R. Boss, James A. Chandler, Barbara C.M. Dudley, Stephen A. Furbacher, Robert M. Kavner, Lafayette Keeney, E. Douglas Kenna, Raymond C. Kennedy, Thomas D. O'Connor, Frank H. Odell, Micheal B. Picotte, James J. Preble, John ·D. Reardon, John A. Reeves, John R. Riedman, John S. Scott, Robert P. Straetz, Charles W. Carey and Robert J. Higgins.

to Fleet's stock price. The action is brought pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a) (West 1981 & Supp.1996), and Rule 10b–5, 15 C.F.R. § 240.10b–5 (1995), and principles of common law.

In a second suit, Plaintiffs Rodney Shields, Micheal Abramsky, Arthur Brooks and Richard Rosenberg brought a shareholder derivative action on behalf of Fleet/Norstar Financial Group, Inc. The plaintiffs' claims were based on Defendants' alleged gross mismanagement of Fleet's loan portfolios and upon the alleged misrepresentation and omission of material information from Fleet's 1990 proxy statement. The Derivative Action Complaint alleged violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a–9 promulgated thereunder, 17 C.F.R. § 240.14a–9, as well as breach of fiduciary duty, corporate waste, and negligent misrepresentation under Rhode Island common law. It also repetitively includes the class action claims under §§ 10(b) and 20 of the Exchange Act.

The origin of both actions is the serious deterioration of real estate values in the New England area that occurred in the second half of 1989 and continued into 1990. One of the consequences was an increase in the number and amount of delinquent bank loans to developers and purchasers of real estate. According to the Amended Class Action Complaint, government regulators also became more active and conservative in their treatment of performing bank loans at this time, having learned from their experiences of dealing with bank failures in Texas in the early 1980's. As a result of this new activism, several New England banking organizations underwent bank examinations and were required to reclassify numerous loans as nonperforming assets. Fleet was one such organization.

On April 3, 1990 Fleet announced that it expected its nonperforming assets to increase by at least 50%, from approximately $400 million in December, 1989, to $600 million in March, 1990. Furthermore, the announcement stated that this total might well be further increased as a result of continuing examination by state and federal regulators. On the same day, there was unusually heavy trading in Fleet's common stock with a volume of 1.8 million shares and a fall of the stock's price of $0.625 per share to close at $21.25, a drop in value of 2.85%. The stock traded in the range of $25–30 during 1989 and in the $23–27 range in early 1990.

On May 3, 1990, Fleet reported results for the first quarter of 1990. In contrast to its $92.4 million net income in the first quarter of 1989, Fleet reported a net loss of $98 million in 1990, in spite of $90 million of nonrecurring gains. Nonperforming loans and losses had more than doubled in the three month period from December 31, 1989, to March 31, 1990, and foreclosed real estate assets had increased from $80 million to $275 million over the same period.

As of March 31, 1990, total nonperforming assets stood at $928 million, of which $552 million was related to commercial real estate. This figure compares with $222 million of commercial real estate related nonperforming assets, and $399 million total nonperforming assets as of December 31, 1989.

The substance of both actions is the assertion that Fleet's management misrepresented to the investing public that the Company was a highly successful banking operation which had deftly managed to avoid the abyss of the deteriorating New England real estate market into which other banks had fallen. Plaintiffs in the class action alleged they were damaged by the amount of decline in value of Fleet stock during the class period. Plaintiffs claim that during that period Fleet stock was depressed in value due to the defendants' improper actions. Members of the class are those individuals or entities that purchased or sold Fleet stock during the class period.

Plaintiffs in the derivative action claimed that the corporation was damaged in two ways. First, it was allegedly damaged in an unknown amount but at a minimum, totals many millions of dollars, measured by the write-offs Fleet took with respect to its increase in nonperforming loans due to the alleged mismanagement. Second, Fleet was damaged due to a downgrade in Fleet's cred-

it rating by Moody's, Standard and Poor's Index ("S & P"), and Fitch in March of 1990 as a result of the increase in Plaintiffs' non-performing assets. The plaintiffs claim that the corporation was damaged in the amount of higher borrowing costs it would have to incur because of Fleet's imprudent lending practices.

### III. Procedural History

The Court and the parties expended a great deal of effort on the issue of whether the derivative and class complaints sufficiently stated a claim upon which relief could be granted. The Court first referred to a Magistrate Judge the defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Class Action Complaint and Consolidated Derivative Action Complaint. On June 5, 1991 the Magistrate Judge returned his recommendation that the defendants' motion be granted and that both complaints be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b). The Magistrate observed that the original consolidated class complaint alleged only conclusory allegations of fraud, failing to make the claim with the requisite particularity.

Subsequently, the Court remanded the matter to a Magistrate Judge for a determination of the questions of whether the Magistrate Judge had been authorized to submit findings, whether diversity existed in the instant shareholder derivative suit, and whether a derivative suit could be brought under § 14(a) of the Exchange Act. The Court's referral order did not include a request for findings. On July 15, 1991, the Magistrate Judge reported affirmative answers to all three questions and for a second time, recommended dismissal of the complaints.

On November 7, 1991, the Court granted class plaintiffs' Motion for Leave to file an amended class complaint. On November 18, 1991, the plaintiffs filed their Second Amended Class Action Complaint, whereupon defendants renewed their Motion to Dismiss. The Court again referred the class and derivative complaints to a Magistrate Judge for a recommendation on Defendants' Motion to Dismiss. On January 3, 1992, after hearing extensive oral argument, the Magistrate Judge reiterated his recommendation that the derivative complaint be dismissed, but recommended that the Motion to Dismiss the Amended Class Action Complaint be denied. The Magistrate concluded (with no explanation whatsoever) that, "[t]he Second Amended Class Complaint ... explicitly plugs the fatal gap with the plaintiffs prior pleadings." (Second Supplemental Report and Recommendations at 7). No reason was given for this turnabout.

On January 22, 1992, the Court heard argument on Plaintiffs' objections to the recommendations of the Magistrate. The Court had the matter under consideration and had applied extensive efforts towards a motion to dismiss *sua sponte*, when a settlement was reached in both proceedings. At that time the Court had arrived at an unannounced conclusion.

In settlement of the class action, Defendants deposited $5,875,000 in a jointly administered escrow account in July, 1992. It has accrued interest since then. As part of the proposed settlement, the parties agreed that reasonable attorney fees for class counsel would be paid out of the fund, but the fees must not exceed 30% of the value of the fund.

The Stipulation of Settlement for the derivative action, proposes that "[t]he Plaintiffs and their counsel agree that they will seek an award of attorney's fees and reimbursement of expenses in total amount not exceeding $499,000, which amount Fleet has agreed to pay if approved by the Court." (Stipulation of Settlement at 6). This type of settlement agreement is known as a "clear sailing agreement." In exchange, the plaintiffs agree to discontinue their derivative suit.

The absence of adversity makes heightened judicial oversight of both of these fee agreements highly desirable, especially since the very existence of a clear sailing agreement increases the likelihood that something of value will have been bargained away by counsel. *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir.1991), *remanded,* 801 F.Supp. 804 (D.Me.1992), *aff'd sub nom. BTZ, Inc. v. Great Northern Nekoosa Corp.*, 47 F.3d 463 (1st Cir.1995). Accordingly, the Court appointed Attorney Gorden P. Cleary as Guardian Ad Litem to

prepare a report, as an adversary, on behalf of Fleet's stockholders with respect to the application for attorney fees in both the class action and derivative suits.

## IV. Discussion

The Court deferred evaluating the settlement in anticipation of a First Circuit decision which clarified the methodology for awarding attorney fees. The case, *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation,* 56 F.3d 295 (1st Cir.1995), dealt with the award of attorney fees in a mass disaster litigation due to a hotel fire in 1986. The First Circuit held that a court may use either the traditional lodestar method to calculate appropriate fees or the newer, percentage-of-the-fund ("POF") approach. The First Circuit observed that in complex litigation the percentage of the fund approach appears to be most efficient to administer. *Id.* at 307.

During the time lapse between the instant settlement and the *In re Thirteen* decision, other opinions emerged from the First Circuit which also influence the Court's decision in regard to the derivative action. The First Circuit filed two decisions in litigation arising out of an application for attorney fees for a voluntary settlement of a class action suit which included a clear sailing agreement. The first decision, *Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d at 520, mandates the level of scrutiny the Court should utilize when confronted with such an agreement. In the second decision, the First Circuit affirmed a district court's decision to deny attorney fees despite the presence of the clear sailing agreement. *BTZ, Inc. v. Great Northern Nekoosa Corp.,* 47 F.3d at 467. Enlightened by these First Circuit rulings, the Court is now better prepared to address the issues at hand.

First, the class action settlement will be considered along with the related attorney fee applications. Then the derivative action proposed settlement and accompanying attorney fee applications will be considered.

### A. The Class Action

#### 1. The Settlement Agreement

▮ Rule 23(e) of the Federal Rules of Civil Procedure provides, in part: "A class action shall not be dismissed or compromised without the approval of the court...." Fed. R.Civ.P. 23(e). In deciding whether to approve a proposed settlement in a class action suit, as required by Rule 23, a district court must examine the terms and circumstances of the settlement to determine if they are "fair, adequate and reasonable." *See Durrett v. Housing Auth. of City of Providence,* 896 F.2d 600, 604 (1st Cir.1990). The court must also determine whether the parties validly consented, whether reasonable notice was given, and whether any terms of the settlement violate Federal law. *Id.* The district court's discretion is circumscribed by the long-recognized policy of encouraging settlements. *Id.*

▮ In determining whether a proposed settlement is fair, reasonable and adequate, courts consider the merits and complexity of the claims, the circumstances of the settlement, the terms of the settlement, and objections to the settlement. *Id.; see also Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir. 1982), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982).

##### (a) The Class Action Claims

In Count I and Count II the class plaintiffs made claims under § 10(b) of the Exchange Act[2] and Rule 10b–5 promulgated thereunder.[3] Common law claims for negligent mis-

---

**2.** Actions under § 20 are for individuals, not corporations. However, when the allegations of fraud against the individual defendants are based upon the same facts and circumstances as that of the corporate defendant, the sufficiency of the allegations against the individuals depends upon whether the allegations are sufficient against the corporation. *Driscoll v. Landmark Bank for Savings,* 758 F.Supp. 48, 54 n. 6 (D.Mass.1991).

**3.** 17 C.F.R. § 240.10b–5 reads, in relevant part: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange ... (b) To make any untrue statement of material fact necessary in order to make the statements made, in the light of the circumstances under which they made, not misleading ... in connection with the purchase or sale of any security.

representation were also asserted in Count III.

In the Second Amended Complaint, the plaintiffs described a time line in which the defendant directors and officers made a series of favorable public statements about the state of Fleet's outstanding loans. The plaintiffs allege that the defendants knowingly or recklessly made these statements despite knowledge of imminent serious economic decline. The plaintiffs claim they relied upon such statements and purchased Fleet common stock at artificially high prices and then were damaged by the sudden subsequent drop in stock prices.

■ A cause of action under § 10(b) survives a Fed.R.Civ.P. 12(b)(6) dismissal if the complaint pleads that 1) the defendants misrepresented or omitted material facts in connection with the purchase or sale of securities; 2) that the plaintiffs relied on such misrepresentations or omissions to their detriment and 3) that the misrepresentations or omissions were made with scienter. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 205–06, 96 S.Ct. 1375, 1386–87, 47 L.Ed.2d 668 (1976).

■ In contrast, a cause of action for a § 10(b) claim may not succeed if it alleges simply fraud by hindsight. *Steiner v. Unitrode Corp.*, 834 F.Supp. 40, 44 (D.Mass. 1993). A court may examine a complaint and allow a § 10(b) claim only when a, "plaintiff makes reference to particular statements where defendants indicated that a known problem had been addressed and remedied, only to be revealed later that the problem was not adequately corrected, resulting in a significant losses to the corporation." *Id.* at 45.

In keeping with this case law, the Second Amended Class Action Complaint sets forth that the defendants' public statements were misleading because the position of similarly situated banks and the activity of bank regulators should have alerted Fleet to amend their policies and to disclose possible problems. The complaint infers that Fleet choose not to disclose imminent problems and instead, deliberately promulgated favorable forecasts.

■ In passing on a settlement agreement, it is not appropriate to adjudicate the merits of the dispute. *See Parker v. Anderson*, 667 F.2d at 1209. It therefore suffices to say that, in the Court's judgment using the charitable test to be applied, class plaintiffs' claims were not wholly without merit, and because of their nature, they presented some risk to both sides.

**(b)** *Circumstances Surrounding the Settlement*

■ Second, the Court considers the circumstances and the timing of the settlement agreement. Both the class plaintiffs and the defendants were represented by competent counsel. There is no suggestion but that agreement was reached through arm's-length negotiation. The timing of the agreement indicates that counsel for both sides were sufficiently apprised of all proffered theories and defenses; by the time agreement was reached, over twenty deposition were conducted, over 200,000 documents were exchanged, and substantial pretrial discovery conducted on both sides.

**(c)** *Terms of the Settlement*

Third, the terms of the settlement must be reviewed. Under the proposed settlement, $5,875,000 plus interest accumulated from June 1992 will be distributed to qualifying shareholders. Shareholders who purchased stock at an inflated trading price, and then later sold the same stock, would receive the difference between the purchase price and sales price. Shareholders who have not sold the stock will receive the difference between the sales price and $18.625, which constitutes the lowest trading price during the relevant period. If the total dollar amount of claims exceeds the settlement sum together with accrued interest, less awarded attorney fees, the funds will be distributed pro rata to the individual shareholders. This arrangement will likely result in reasonable compensation to the class members for the alleged losses sustained as a result of Defendants' complained-of conduct.

#### (d) *Objections to Settlement*

Fourth, objections, or the lack of objections to the proposed settlement must be taken into account. Of the over 40,000 potential present and former shareholders who may qualify to recover under the proposed settlement agreement, only a handful—under ten—have objected. Such a small number of objectors should not interfere with the approval of an otherwise fair and reasonable settlement agreement.

In light of the complexity of the claims presented, the timing and circumstances of the parties' agreement to settle, and the insignificant number of objections to the proposed settlement, the Court concludes that the proposed class action settlement appears to meet the "fair, reasonable, and adequate" requirement. Consent was freely and validly given, and notice of the proposed settlement was valid. The Court therefore approves the class action proposed settlement.

#### 2. *Attorney Fees*

Because the class action proposed settlement is approved, the attorney fee applications of the class plaintiffs' counsel must be determined. Four out-of-state law firms and one local firm participated in the class action suit. Counsel have submitted applications seeking compensation for over 7,300 hours of legal work which, according to their calculations, equals over $1,200,000 at local rates. Counsel also request over $600,000 for expenses, a total of more than $1,800,000.

The Court finds that the lawyers' fees in this case are quite excessive. One firm contends that it took 76.50 hours to amend the complaint. (Guardian ad Litem Report at 23) There are records containing entries for administrative, non-legal activities that should not be compensated as professional services. There are submitted records of phone conversations and conferences unconnected to a subject matter description. Another example of an excessive application entry are the deposition records. For example, one firm submits 271.25 hours of depositions, but often these depositions were double-teamed—one lawyer working, the other "standing by." (Guardian ad Litem Report at 23) Another firm submits the time rec-

ords of one lawyer who provoked little comment in the suit's documentation, but he apparently generated 670 hours billed to the class action suit. (Guardian ad Litem Report at 27). Keeping in mind the remarkable absence of economy and efficiency in the lawyers' applications, the mode of fee calculation is next considered.

#### (a) *Which Method of Calculation?*

Traditionally, in cases which result in the creation of a common fund, attorney fees were computed as a reasonable percentage of the fund. *See, e.g., Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116, 127–28, 5 S.Ct. 387, 392–93, 28 L.Ed. 915 (1885) (cited in *In re Thirteen Appeals Arising Out Of San Juan Dupont Plaza Hotel Fire Lit.,* 56 F.3d at 305). Federal Circuit Courts began in the 1970's to displace the traditional method with the more detailed inquiry of the lodestar method, which requires courts to determine the number of hours reasonably expended, multiply them by a reasonable hourly rate, and then multiply the total by a "multiplier," to increase or decrease the award as circumstances warrant. *See, e.g., Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.* (Lindy I), 487 F.2d 161, 166–69 (3d Cir.1973); *see also* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees,* 108 F.R.D. 237, 242–43 (1985) (hereinafter "Third Circuit Report"). This trend grew rapidly, and the lodestar method, or other methods closely resembling it, predominated. *See* Third Circuit Report at 244.

A retreat from the lodestar method to the conventional percentage-of-the-fund approach began in 1984 after the Supreme Court remarked in dictum that the percentage-of-the-fund approach is appropriate in common-fund cases, whereas the lodestar method is appropriate in statutory fee-shifting cases. *See Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1985) ("unlike the calculation of attorney's fees under the 'common fund doctrine', where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expend-

ed on the litigation"). The retreat was fueled by a report of a task force assembled at the direction of Chief Judge Aldisert of the Third Circuit. *See generally* Third Circuit Report.

The Third Circuit Report concluded that the percentage-of-the-fund approach was the preferred method of calculating attorney fees in common-fund cases. *Id.* at 255. Presently, seven circuits permit the use of the percentage-of-the-fund approach in common fund cases. *See In re Thirteen Appeals,* 56 F.3d at 307 ("we hold that in a common fund case the district court, in the exercise of its informed discretion, may calculate counsel fees either on a percentage of the fund basis or by fashioning a lodestar"); *In re Washington Public Power Supply System Securities Lit.,* 19 F.3d 1291, 1296 (9th Cir.1994) ("in common fund cases, no presumption in favor of either the percentage or the lodestar method encumbers the district court's discretion to choose one or the other"); *Rawlings v. Prudential–Bache Properties, Inc.,* 9 F.3d 513, 516 (6th Cir.1993) ("it is necessary that district courts be permitted to select the more appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them"); *Swedish Hospital Corp. v. Shalala,* 1 F.3d 1261, 1271 (D.C.Cir.1993) ("a percentage of the fund method is the appropriate mechanism for determining the attorney fees award in common fund cases"); *Camden I Condominium Association v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991) ("we believe that the percentage of the fund approach is the better reasoned in a common fund case"); *Harman v. Lyphomed, Inc.,* 945 F.2d 969, 975 (7th Cir.1991) ("the decision of whether to use a percentage method remains in the discretion of the district court"); *Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir.1988) ("the award of attorneys' fees on a percentage basis in a common fund case is not per se an abuse of discretion"), *cert. denied,* 488 U.S. 822, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). In the federal circuits courts, use of the POF is mandatory. *See Swedish Hospital Corp. v. Shalala,* 1 F.3d at 1271 (D.C.Cir.); *Camden I Condo-*

*minium Association v. Dunkle,* 946 F.2d at 774 (11th Cir.).

The First Circuit recently endorsed the use of the percentage-of-the-fund approach in common-fund cases in *In re Thirteen Appeals Arising Out Of San Juan Dupont Plaza Hotel Fire Litigation,* 56 F.3d at 307. The court remarked that its decision was "driven both by [its] recognition that use of the [percentage-of-the-fund] method in common fund cases is the prevailing praxis and by the direct advantages that the [percentage-of-the-fund] method can bring to bear in such cases." *Id.* The court remarked that the percentage approach is often less burdensome to administer, it enhances efficiency in legal representation, and it better approximates the workings of the marketplace, while acknowledging that the approach risks overcompensating counsel and may provide a disincentive for counsel to commit to difficult cases with small possible rewards. *Id.* Despite this strong endorsement, the First Circuit left it to the discretion of the district court to choose which method of calculation to apply in common-fund cases.

█ The circumstances of the present case warrant utilization of the percentage-of-the-fund approach. In light of the extraordinarily large number of attorneys and support staff involved in the representation of the class and the extraordinary number of hours of legal work for which counsel seek compensation—over 7,300—the task of administering the lodestar method of calculation is both overwhelming and wasteful. Furthermore, the percentage approach "better approximates the workings of the marketplace." *Id.* Counsel also agree that the percentage-of-the-fund approach is warranted.

(b) *The Percentage Figure*

There exists no set formula for determining what percentage of a common fund should be awarded as attorney fees. Many courts refer to average or typical percentage figures as starting points, and then adjust the figures as the circumstances of the case may warrant. *See* Alan Hirsch & Diane Sheehey, Awarding Attorneys' Fees and Managing Fee Litigation 68–70 (Federal Judicial Center 1994) (hereinafter "Awarding

Attorney Fees"). Counsel have agreed that 30% should be a ceiling figure for fees.

In common-fund cases, the majority of attorney fee awards fall between 20% and 30% of the fund. *See Camden I,* 946 F.2d at 774; Awarding Attorney Fees at 68. Some courts have declared certain percentages to be "benchmark" figures, or starting points from which departure may be made only where "special circumstances" warrant it. *See Torrisi v. Tucson Electric Power Co.,* 8 F.3d 1370, 1376 (9th Cir.1993) ("in common fund cases such as this, we have established 25% of the common fund as the 'benchmark' award for attorney fees"), *cert. denied sub nom. Reilly v. Tucson Electric Power Co.,* —— U.S. ——, 114 S.Ct. 2707, 129 L.Ed.2d 834 (1994). Some courts still utilize factors employed in the lodestar determination to fashion a percentage award. *See Camden I,* 946 F.2d at 775; *Brown v. Phillips Petroleum Co.,* 838 F.2d at 454–55. The Court of Appeals for the First Circuit has not set forth any benchmark percentage figure, nor has it provided a definitive list of factors for the fee determination. Rather, it has remarked that, "in respect to fee awards, the trial court's latitude is 'extremely broad'." *In re Thirteen Appeals Arising Out of San Juan,* 56 F.3d at 309, *quoting Lipsett v. Blanco,* 975 F.2d 934, 937 (1st Cir.1992).

In the absence of instructive precedent dealing with percentage-of-the-fund factors, some assistance may be found in the twelve factors enumerated in an older Fifth Circuit decision which calculated attorney fees in a Title VII class action. *See Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974). The factors are: 1) the time and labor required; 2) the novelty and difficulty of the questions involved; 3) the skill requisite to perform the legal service properly; 4) the preclusion of other employment by the attorney due to acceptance of the case; 5) the customary fee; 6) whether the fee is fixed or contingent; 7) time limitations imposed by the client or the circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation, and ability of the attorneys; 10) the "undesirability" of the case; 11) the nature and length of the professional relationship with the client and; 12) awards in similar cases. *Id.; see also Mokover v. Neco Enterprises, Inc.,* 785 F.Supp. 1083, 1091 (D.R.I.1992).

Of those listed factors, "the amount involved and the results obtained" is of particular influence. Ultimately, the issue is whether the settlement is beneficial to the class members. The Delaware Court has also emphasized that the result achieved is the most important factor when determining fees. *Dow Jones & Co. v. Shields,* No. 184, 1992 WL 44907, at *2 (Del. Ch. Jan. 10, 1992) ("the primary emphasis in Delaware has been on the value of the benefit obtained by the litigation").

Here, Fleet has offered close to $6 million in settlement. There is no evidence of the alleged actual amount of loss to shareholders involved. That failure of evidence must be attributed to the fee applicants since they bear the burden. *Weinberger,* 925 F.2d at 527. Considering the swarms of lawyers involved in this action, the extensive discovery, the expenses incurred by counsel which exceeded $600,000.00 it is obvious that there were great expectations for a very large verdict. In so far as the result is concerned, there was no effort made to demonstrate how beneficial it was to individual stockholders. Since Fleet stock is publicly traded, the number of shares involved must be large and it may be that the benefit to each shareholder is minimal. The class period is a time of more than one year before April 4, 1990. As previously noted, 1.8 million shares changed hands on April 3, 1990 alone. As stated above, the burden of proof is on the fee applicants, and the proof is lacking.

There is one further factor. If the balance of the settlement, after deduction of counsel fees and expenses, is not sufficient to satisfy shareholders in full, the award to individual shareholders is reduced pro rata. Thus, the burden of any insufficiency is borne not by counsel but by the individual stockholders.

Given the circumstances, a percentage figure at the low end of the range is a reasonable reward for attorney fees. Recognizing the discretion the Court has in choosing the appropriate figure, it is worth repeating the Delaware Court's observation that,

"[t]he process of determining a reasonable fee is not scientific. It is necessarily a judgment call based on a weighing of all relevant factors, that serves as a concededly imperfect substitute for the market place where attorney compensation is normally fixed." *Chalfin v. Hart Holdings Co., Inc.,* No. 11611, 1990 WL 181958, at *10–11 (Del. Ch. Nov. 20, 1990).

A figure of 20% is adequate and fair given the circumstances. Hence, the appropriate fee is $1,175,000. Twenty percent is within the range for common-fund cases of this genre, albeit at the low end. Counsel committed a substantial amount of time to this case, and in doing so assumed a substantial risk of loss. Again, the claims involved substantial discovery. Settlement was reached rather late in the game, after much time and enormous amounts of energy was expended in discovery and trial preparation. These factors weigh against a setting of the percentage below 20%. A larger percentage, however, does not appear warranted, as it appears many, many hours were wasted as a result of the class's deficient initial complaint, which had to be amended after dismissal proceedings. Furthermore, as acknowledged by the Guardian, the fee applications were otherwise questionable due to extensive duplication of efforts, overcharging, and other causes.

The Guardian's Report that many expenses claimed by counsel were either not recoverable or were excessive, such as computer-assisted legal research charges, copying costs, express mail and messenger services costs, secretarial overtime costs, and travel expenses is well founded in fact. *See Weinberger,* 801 F.Supp. at 827–28; *Mokover v. Neco Enterprises,* 785 F.Supp. 1083, 1093–94 (D.R.I.1992). The Guardian's conclusion that $215,871.72 should be allowed for expenses is not seriously contested, nor should it be. An additional expense to be paid is compensation for the Guardian ad Litem, Gordon P. Cleary. Mr. Cleary has submitted a fee application which documents a total of 234.45 hours attributed to this matter. The dollar amount owed is $50,018.50. This is eminently fair and reasonable based not only on the amount of effort expended but also upon its quality in a setting that is less than pleasant for any lawyer. The bill includes work on both the class action and derivative suit, therefore, the fund should be used to pay only half of Mr. Cleary's fee, $25,009.25. *See Granada Investments, Inc. v. DWG Corp.,* 962 F.2d 1203 (6th Cir.1992) (holding that money spent on accountants and investment bankers are not private cost and thus eligible for reimbursement by settlement fund).

Twenty percent of the initial common fund figure equals approximately $1,175,000. This figure exceeds counsel's calculation at local rates by more than $500,000. The fund has been accumulating interest since the time agreement was reached, and thus, 20% of the fund with 20% of the accrued interest should be paid to class action plaintiffs on account of counsel fees. Interest is allowed on permitted expenses in the proportion that the allowed expenses bears to the total fund. A comparison of the lodestar amount and the percentage of the fund amount reaffirms that 20% is a reasonable percentage of the fund.

### (c) *Distributing the Fees*

The Court will allow lead counsel for the class as agreed to present a proposed plan for allocation of the awarded fees, expenses and interest. *See In re Crazy Eddie Securities Litigation,* 824 F.Supp. 320, 328 (E.D.N.Y.1993); *In re Chrysler Motors Corp. Overnight Evaluation Program Litigation,* 736 F.Supp. 1007, 1017 (E.D.Mo.1990). Counsel have agreed to this approach.

### B. *The Derivative Action*

#### 1. *The Settlement Agreement*

Pursuant to Fed.R.Civ.P. 23.1, a derivative suit "shall not be dismissed or compromised without the approval of the court." *See* Fed. R.Civ.P. 23.1. The approval requirement is a necessary means of preventing "buy-off"— private suits in which defendants could offer private, out-of-court settlements that work to benefit a small group of plaintiffs and lawyers, while acting to the detriment of uninformed, non-participating stockholders. By forcing court supervision, the federal rule ensures that the derivative suit does not

become a vehicle solely to benefit plaintiffs and their lawyers. *See* 7C Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1839 (1986 & Supp.1996). These same concerns motivate the settlement approval for class action suits in accordance with Fed.R.Civ. Pro. 23(e). In either type of suit, there is, "the potential risk that the plaintiffs' attorneys and defendants will team up to further parochial interests at the expense of the class...." *Weinberger*, 925 F.2d at 524.

■ As in the previous class action analysis, the Court's duty is two-fold; first, to decide whether the entire settlement agreement is fair, reasonable and adequate and thus, deserves judicial approval. *Schlusselberg v. Colonial Management Assoc., Inc.*, 389 F.Supp. 733, 735 (D.Mass.1974). Then, it will determine whether to award attorney fees, and if so, how much. The First Circuit warns, "[w]e believe it to be self-evidence that the inclusion of a clear sailing agreement in a fee application should put a court on its guard, not lull it into aloofness." *Weinberger*, 925 F.2d at 525.

(a) *Legal Standards*

■ As noted in the preceding section, the First Circuit provides a specific laundry list with which a district court may evaluate a settlement.

[T]he district court must assure itself that the parties have validly consented; that reasonable notice has been given possible objectors; that the settlement is fair, adequate and reasonable; that the proposed decree will not violate the Constitution, a statute, or other authority; that it is consistent with the objectives of Congress; and if third parties will be affected, that it will not be unreasonable or legally impermissible as to them.

*Durrett v. Housing Authority of City of Providence*, 896 F.2d 600, 604 (1st Cir.1990).

In this action the settlement is voluntary. There is no evidence of coercion or outright collusion. Furthermore, at the direction of the Court, in 1992 Fleet mailed the settlement agreement notices to all record shareholders, approximately 41,856 common stockholders. As of August 1995, only five of Fleet's 41,000 shareholders objected to the derivative settlement, and those objectors did not offer any support for their objections. Given this passivity, the stockholders' objections do not prevent judicial settlement approval. *Greenspun v. Bogan*, 492 F.2d 375, 380 (1st Cir.1974) ("the absence of any detailed opposition is a relevant, if not always reliable, factor in assessing the fairness of such a proposal").

Additionally, the settlement is not disqualified for any legislative or constitutional violations. The proposed derivative settlement does not offend state or federal statutes, nor the Constitution. The last and most prominent criteria is whether the settlement is fair, reasonable and adequate.

■ In considering whether the settlement is fair, reasonable and adequate, a court may weigh the following factors: 1) plaintiffs' likelihood of success and damage recovery at trial; 2) amount of the settlement in relation to the amount at issue; 3) whether the major causes of action in the complaint are in the settlement; 4) whether there are distinctions among class members in the settlement; 5) the state of discovery; 6) if there are objections to the settlement and; 7) whether settlement was achieved at arm's length negotiation. *Berenson Co. v. Faneuil Hall Marketplace*, 671 F.Supp. 819, 823 (D.Mass.1987).

■ The law also provides that judicial "approval should be given if the settlement is fair, reasonable, and adequate ... The most important factor is the strength of the case for the plaintiffs on the merits, balanced against the amount offered in settlement. This factor is sometimes referred to as the likelihood of success." *Schlusselberg*, 389 F.Supp. at 735, *citing West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 740 (S.D.N.Y. 1970), *cert. denied, sub nom. Cotler Drugs v. Chas. Pfizer & Co.*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

(b) *The Merits of the Derivative Action*

The merits of the derivative action were tenuous at best. Contemporaneous with the derivative action settlement, the Court had

completed an opinion concerning dismissal of the complaint. The Magistrate Judge had recommended dismissing the derivative suit for the following three primary reasons: (1) the allegations of fraud lack the requisite specificity; (2) three derivative claims improperly reiterated class action claims and; (3) claims of corporate mismanagement are pendant claims, over which this federal court no longer retains jurisdiction.

As noted in the previous section discussing the class action settlement, the Court will not pass on the merits of a suit when evaluating a settlement offer. *Parker v. Anderson,* 667 F.2d at 1209. However, the merits, or lack of merit, of the derivative claim influences the Court's provision of attorney fees, as an element of the settlement offer.

#### (c) *Settlement Approval*

 While a brief evaluation of the claims leads the Court to seriously doubt the value of the plaintiffs' derivative action, approval of the settlement is warranted. The proposed settlement offered by Fleet obviously does not provide for a payment of damages to itself. It includes only the option of payment of Plaintiff's attorney fees. This is the only possible financial recovery available to Plaintiff. For reasons discussed below, the Court declines to award attorney fees to derivative Plaintiff counsel. Therefore, Fleet is not required to pay anything to Plaintiffs. A settlement which includes only the possibility of the payment of attorney fees is fair, adequate and reasonable in light of the weak claims presented by Plaintiff and the tenuous casual connection between the derivative suit and therapeutic alterations to Fleet's financial operating policies.

In addition, it defies logic that Fleet should be required to pay attorney fees when Plaintiff is suing on behalf of Fleet. Should such a transaction occur, the reimbursement for alleged damage to Fleet, is paid for by the alleged victim, Fleet. Even if the individual Fleet officers and directors were held liable, it may be that Fleet would indemnify them and thus, again pay for its own alleged injury. As a Rhode Island corporation, Fleet is subject to Rhode island law which provides that, "[a]ny bank, savings bank, or trust com-

pany may, by by-law, authorize its directors or trustees to indemnify and reimburse any person . . . Who at any time serves or shall have served as director, trustee, officer, or employee of such bank. . . ." R.I. GEN.LAWS § 19–3–2 (Michie 1989 & Supp.1995); *see also* R.I. GEN.LAWS 7–1.1–4.1 (Michie 1992 & Supp.1995) (indemnification generally with respect to corporate directors). The Rhode Island statute does not require indemnification if the directors acted negligently. *Id.* In order to avoid a redundant outcome and for the reasons hereafter stated, the Court, pursuant to the authority of Fed.R.Civ.P. 23.1, approves the derivative suit settlement.

#### 2. *Attorney Fees*

The settlement agreement reads, "[t]he Plaintiffs and their counsel agree that they will seek an award of attorneys' fees and reimbursement of expenses in a total amount not exceeding $499,000, which amount Fleet has agreed to pay **if approved by the Court.**" (emphasis added) Stipulation of Settlement ¶ 3.

Plaintiffs' counsel submit that they should receive the entire $499,000 set-aside for fees. Moreover, they contend that this amount is significantly lower that their actual lodestar and expenses measured at $951,703.92. Plaintiffs argue that $499,000 is a fair and reasonable fee amount in exchange for the benefit conferred on Fleet due to the initiation of the derivative suit.

In contrast, the Guardian Ad Litem report argues either that Plaintiffs' counsel should receive no fee award, despite the clear sailing agreement, or in the alternative, the award should be discounted by a substantial figure because the derivative action did not raise a meritorious claim.

#### (a) *Legal Standards*

Normally, litigants bear their own attorney fees under a principle commonly known as the "American Rule." *In re Thirteen Appeals Arising Out of San Juan,* 56 F.3d at 304; *see also Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 245, 95 S.Ct. 1612, 1615–16, 44 L.Ed.2d 141 (1975). However, there are some exceptions to this rule.

For example, there are fee-shifting statutes which require the losing side to pay the attorney fees of the prevailing side. *See, e.g.,* 42 U.S.C. § 1988; *see also Texas State Teachers Ass. v. Garland Ind. School Dist.,* 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989).

▮▮▮▮ Another exception is in a "substantial benefit" situation in which a suit may be mooted or settled but nonetheless renders a substantial pecuniary or nonpecuniary benefit to a larger class. In that particular instance, when the beneficiaries are corporate stockholders, the court may utilize its equitable jurisdiction to assess attorney fees which must be paid by the corporate defendant. Similarly, when counsel creates a "common fund" for the benefit of a class, the Court will award attorney fees from that financial fund. *See Mills v. Electric Auto-Lite,* 396 U.S. 375, 396–97, 90 S.Ct. 616, 627–28, 24 L.Ed.2d 593 (1969); *Sprague v. Ticonic National Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939).

This action as a stockholder's derivative suit may have incidentally conferred a benefit on shareholders. It cannot be labeled a common benefit case. The existence of the clear sailing agreement slightly alters the analysis. The First Circuit notes this categorization difficulty, "the BTZ fee application does not fit squarely under the common benefit doctrine since BTZ abjured a claim for fees under the common benefit doctrine both by negotiating the clear sailing agreement and by relying on the clear sailing agreement as the basis for its alleged fee entitlement." *BTZ,* 47 F.3d at 466 (internal citations omitted).

Since this case is neither a common benefit case, nor a statutory fee-shifting case, the question becomes, under what authority may the Court determine attorney fees? The First Circuit entertained just that question and concluded, that a court may use equitable powers to exercise discretion over attorney fee applications. *Weinberger,* 925 F.2d at 523; *see also Angoff v. Goldfine,* 270 F.2d

185, 186 (1st Cir.1959) (affirmed federal jurisdiction to issue order fixing counsel fees in derivative suit).

Based upon that authority, the First Circuit went on to hold that awarding fees may be proper if plaintiff's counsel show how their participation was a "substantial or material factor" in the outcome of the settlement and the resulting benefit to the company. *BTZ,* 47 F.3d at 466.[4]

### (b) *Delaware Law—Merit, Benefit and Connection*

It is impossible to quantify in dollars and cents exactly how and to what degree a particular law firm contributed to the derivative settlement since there is no dollar amount, except possible attorney fees, involved. In fact, there may be no causation at all, but rather, simply a fortuitous instance of being in the right place at the right time. In light of those difficulties, a helpful causation test for attorney fees may be found in Delaware corporate law.

▮▮▮▮ The Delaware Court of Chancery states that in a common benefit case attorney fees are proper when, "the action confers some benefit upon the corporation ... [and] the action, when filed, was meritorious, and had a causal connection to the conferred benefit." *Baron v. Allied Artists Pictures Corp.,* 395 A.2d 375, 379 (Del.1978), *aff'd* 413 A.2d 876 (Del.1980), *citing Chrysler Corp. v. Dann,* 223 A.2d 384, 387 (Del.1966). The most important criteria is whether the claim is meritorious because otherwise baseless litigation may be encouraged. *Baron,* 395 A.2d at 379.

### (i) *Merits of Claims*

▮▮▮▮ A claim is meritorious if "it can withstand a motion to dismiss on the pleadings" and "at the same time, the plaintiff possess knowledge of provable facts which hold out some likelihood of ultimate success. It is not absolutely necessary that factually there be absolute assurance of ultimate suc-

---

4. The First Circuit affirmed a district court's ruling that plaintiff's counsel took no part in the pivotal litigation to bring about a tender offer and subsequent corporate benefit. *BTZ,* 47 F.3d at 466. The district court had examined the attorney's activities and influence on the proceedings, or lack thereof, in order to justify denying fees. *Weinberger,* 801 F.Supp. at 811.

cess, but only that there be some reasonable hope." *Id.* at 379 (citation omitted).

The derivative action suit was not comprised of meritorious claims. First, the plaintiff's claim based on § 10 of the Exchange Act and Rule 10b–5 sounded in fraud, therefore, had to comply with the "particularity requirement" of Fed.R.Civ.P. 9(b). When a claim of fraud is made, the Federal Rules of Civil Procedure demand that the complaint contain the supporting specifics. *See* Fed. R.Civ.P. 9(b). In addition, the precedent of this Court and the First Circuit require strict enforcement of this interpretation of Rule 9(b). *See Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1223 (1st Cir.1996); *see also New England Data Services, Inc. v. Becher,* 829 F.2d 286, 288–89 (1st Cir.1987); *see also Haft v. Eastland Financial Corp.,* 755 F.Supp. 1123, 1133 (D.R.I.1991).

The amended derivative complaint does not comport with Rule 9(b). It includes conclusory allegations of fraud, relying upon SEC filings and newspaper articles. The best the plaintiffs can do is prove that the defendants made announcements which proclaimed good news about the Fleet's finances. Plaintiffs do not demonstrate how these statements or omissions were fraudulent. *See Shaw,* 82 F.3d at 1217 ("courts have demonstrated a willingness to find immaterial as a matter of law certain kind of rosy affirmation commonly heard from corporate managers").

Beyond the lack of specificity, the derivative complaint is also deficient because there are three counts which mirror the class action complaint and thus, are not appropriately derivative actions at all. Such overlap exists despite the fact that the Court ordered, to no avail, the plaintiffs to consolidate their class action claims into one complaint, and their derivative claims in another. (Consent Order for Consolidation at 3).

This duplication in claims suggests that the derivative action was, in part, an attempt to attach to the tailcoats of a mediocre class action suit and create a derivative action. Yet there are significant differences between the two causes of action. A viable derivative action is a suit which identifies specific injury done to a corporation by the alleged bad acts of its directors and officers. Any recovery would belong to the corporation. While a derivative suit is initiated by stockholders, it is only as "next friend". *Koster v. (American) Lumbermens Mutual Casualty Co.,* 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947).

In contrast, a class action suit is a direct suit between stockholders and the corporation. The stockholders must demonstrate injury done to them, not the corporation, by the alleged bad acts. Moreover, any recovery would go to the stockholders and not into the coffers of the corporation.

In the instant derivative case, Plaintiff improperly averred the following: Count II (§ 10b–5 class claim under the Exchange Act, Count IV (§ 20(a) of the Exchange Act) and Count V (a common law negligent misrepresentation claim). These claims were properly plead in the Amended Class Action Complaint; thus, they would have been dismissed in derivative action.[5] Therefore, these claims are not meritorious, and do not support a fee application.

In contrast, Count I and Count III of the derivative action were not impermissible repeats of viable class action claims. Rather, Count I consists of pendant state law claims and Count III contains federal securities claims. Despite their proper appearance as derivative claims, neither Count could have survived a motion to dismiss, and so too are not meritorious.

Count III alleges a violation of § 14(a) of the Exchange Act and Rule 14a–9, promulgated thereunder, because the defendant allegedly did not disclose certain information in proxy statements sent to Fleet shareholders when soliciting their votes on issues to be discussed at the 1990 Annual Meeting. Plaintiffs claimed that this nondisclosure was due to the incompetence of the directors and officers of Fleet and it created a defective method of selecting an independent public accountant.

---

5. The purpose of derivative suits are for stockholders to step into the shoes of a damaged corporation and seek redress from responsible insiders. The class action suit serves another purpose, addressing the direct injuries to stockholders done by illegal activity by a corporation.

The failure of an officer or director to disclose corporate mismanagement has been held not to be actionable under § 14(a). *Kas v. Financial General Bankshares, Inc.,* 796 F.2d 508, 513 (D.C.Cir.1986) ("if the validity of a shareholder's claim of material misstatement or nondisclosure rests solely on a legal determination that the transaction was unfair to a minority shareholder or that an officer or director's conduct amounted to a breach of his fiduciary duty, the claim does not state a cause of action under section 10(b) or 14(a) of the Securities Exchange Act."); *see also Backman v. Polaroid Corp.,* 910 F.2d 10, 12–13 (1st Cir.1990); *Pavlidis v. New England Patriots Football Club, Inc.,* 737 F.2d 1227, 1236 (1st Cir.1984). Therefore, Count III fails to state a claim upon which relief may be granted.

Similarly, Count I also claims various breaches of fiduciary duty, breach of the duty of loyalty and corporate waste; all claims under the common law of the state of Rhode Island. Federal jurisdiction over a state claim was originally permitted because there was diversity of citizenship between the parties. As the case developed, Plaintiffs withdrew the allegation of diversity and the state claims remained due to supplemental jurisdiction. Yet, if there are no other viable derivative claims then the Court no longer retains jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *see also Haft v. Eastland Financial Corp.,* 755 F.Supp. 1123, 1134 (D.R.I.1991); *Driscoll v. Landmark Bank for Savings,* 758 F.Supp. 48, 54 (D.Mass.1991).

Besides jurisdictional infirmities, Plaintiff's state law claims also have substantive legal defects. In order for the plaintiff to prevail under Rhode Island Business Corporation Act on fiduciary duty breaches, they must allege knowing, intentional or bad faith misconduct. The Magistrate's observation that Plaintiff's complaint did not sufficiently allege specific officer misconduct as required by Rhode Island law bears repeating. Thus, Count I would not withstand a motion to dismiss, and thus, is not a meritorious claim. *See Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991).

It is also quite probable that the Business Judgement Rule ("BJR") could bar any recovery by Plaintiff based on mismanagement claims. "The Business Judgement Rule shields directors and officers from liability for corporate decisions made in good faith and after due care." *Resolution Trust Corp. v. Gladstone,* 895 F.Supp. 356, 368 (D.Mass. 1995). The mismanagement claimed by Plaintiff and the supposed, subsequent harm to Fleet does not allege specific acts of bad faith by particular directors or officers. The potential BJR defense further augments the conclusion that the plaintiff's derivative action contains no meritorious claims.[6]

Finally, Plaintiff counsel argues that the timing of the settlement, just prior to trial, indicates that the claim was meritorious. The Court rejects the proposition that the timing of settlement signals a meritorious claim. The timing of the settlement may simply demonstrate the steadfast determination of counsel to be compensated for their services.

Notice should also be taken of the excessive attorney fee applications submitted in the face of such a weak derivative suit. For example, lead counsel contends that they spent 2,700 billable hours working on this case. In fact, one lawyer from the firm worked an entire 26.25 hours in one day on the matter. (Guardian ad Litem Report at 5). While derivative counsel admitted that the factual predicate for the derivative suit was identical to that necessary for the class action suit, there was consistent redundantly staffed depositions. One firm claims more than 300 lawyer hours for depositions, and co-counsel for the derivative claims more

---

**6.** At the time of the settlement, the plaintiffs did have a pending motion to amend derivative complaint, dated February 14, 1992. Perhaps such an amendment could have resuscitated their claim, perhaps not. The Court will look only at the actualities, not entertain speculations. *See Allied Artists Pictures Corp. v. Baron,* 413 A.2d 876, 879 (Del.1980) ("the question of merit for compensation is properly determined as of the commencement of the lawsuit and not by developments thereafter which could not have been known in the exercise of reasonable diligence at the time of filing").

than 170 hours for depositions. (Guardian ad Litem Report at 11, 16).

## (ii) *Benefits to Fleet*

The next level of inquiry is whether such activity and shaky claims conferred any benefit on Fleet. There is no dispute that after this litigation began Fleet undertook steps to enhance its loan portfolios and credit process. Some of the improvements include refined credit policies, additional procedures designed to ensure that loss reserve levels are adequate and more reporting on asset quality to Fleet's Board of Directors. Other more specific changes include a new, comprehensive Commercial Credit Policy which was distributed to all lending officers; a Consumer Policy Manual was developed; a new position was devised in April 1991, Corporate Senior Vice President responsible for credit administration; another new position was made, a risk manager to work with loan officers; and expanded loss reserve analysis and documentation requirements. However, this litigation was but a straw in the wind so far as Fleet's financial circumstances were concerned.

## (iii) *Casual Connection between Derivative Suit and Benefits*

Mr. Emery Covington, the Corporate Vice President and Director of Corporate Loan Review for Fleet, submitted an affidavit pointing out various institutional changes Fleet has undergone. However, the Covington affidavit illustrates by exclusion that the derivative action was not the main impetus for change. His remarks include the statement, "[s]ince these derivative actions were filed in April 1990, and in response to these lawsuits, **and other changes in the economic and regulatory environment,** Fleet has undertaken major initiatives . . . ." (emphasis added) (Aff. Fleet Vice President Covington at 1). Mr. Covington ends his affidavit, "[t]hese changes are attributable, **in part,** to the shareholders' derivative actions." (emphasis added) (*Id.* at 7). What is left out is the fact of a banking crisis of gigantic proportions and in response, decisive and forceful regulatory action.

At best, Mr. Covington makes a tepid endorsement of the effect and influence of the derivative action. He does not attempt to quantify or particularize what about the derivative action inspired the changes. This affidavit exemplifies a lack of real causation between the derivative action suit and subsequent improvements to Fleet's policies.

Delaware law provides that to establish sufficient casual connection, "the benefit need not be directly and entirely attributable to the underlying litigation." *Dunkin' Donuts Shareholders' Litig.,* No. C.A. 10825, 1990 WL 189120, at *6 (Del.Ch. Nov. 27, 1990), *citing In re Maxxam Group, Inc. Stockholders Litig.,* No. C.A. 8636, 1987 WL 10016, at *11–12 (Del.Ch. April 16, 1987). Furthermore, the Delaware Court also commented, "what is relevant is the benefit achieved by the litigation, not simply a benefit that, *post hoc ergo propter hoc,* is conferred after the litigation commences." *In re Anderson Clayton Shareholders' Litigation,* No. C.A. 8387, 1988 WL 97480, at *2 (Del.Ch. Sept. 19, 1988).

Plaintiffs' counsel has not demonstrated specific connection between the derivative suit and the institutional benefits to Fleet sufficient to warrant fees. Clearly, Fleet underwent therapeutic changes because of a timely convergence of external economic factors and regulatory efforts.

In consideration of all three criteria, merit, benefit and casual connection, attorney fees for derivative counsel is not proper because the action was not meritorious. Therefore, the derivative action could not have played a substantial role in the settlement and subsequent benefits to Fleet.

Public policy reasons also play a role in the denial of fees. It would be inconsistent for the Court to find a suit meritless and little more than harassing and at the same time, award attorney fees. Rewarding meritless suits would only encourage superfluous activity that ultimately only hurts the public.

One last word with the benefit of hindsight. In order to control the potential explosion in claims for attorney fees, and the protracted litigation that often follows, and to protect parties from meritless suits, the Third Circuit Report's recommendation that

counsel and the court frankly discuss, and perhaps set, various fee matters at the scheduling and pretrial conferences has obvious merit. *See* Third Circuit Report at 268. Following this procedure, the Court could essentially stop the clock from running wildly and prevent the stockpiling of fees in either a class action or a derivative action suit. *See* Awarding Attorneys' Fees at 97–98.

### V. Conclusion

The Court is well aware that this litigation was protracted and complex. Yet, it is worth remembering that the true genesis of this litigation was an unfortunate downturn of the real estate economy in New England.

Perhaps the injuries alleged by the stockholders in this case are attributable only to an economic downturn that no one is responsible for, perhaps not; rather than determine that issue, Fleet agreed to settle the cases. In both the derivative suit and the class action suit, the Court approves the settlements and awards attorney's fees, expenses and interest to the class action attorney and denies attorney fees, expenses and interest to derivative action counsel.

Since the Guardian ad Litem's efforts assisted in resolving the fee issue concerning the derivative action, it is only equitable that the balance due of his fee be paid from the fund made available by Fleet Bank for the satisfaction of the derivative action.

So Ordered.